Arlene Gordon-Oliver & Associates, PLLC
Attorneys for the Debtor
199 Main Street, Suite 203
White Plains, New York 10601
(914) 683-9750

Arlene Gordon-Oliver, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
In re:                                                                                    Chapter 11
                                                                                                Case No. 14-22773 (RDD)

Allen Memorial Church of God in Christ, Inc.

                                                Debtor.

-----------------------------------------------------------------------X

DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364
FOR INTERIM AND FINAL FINANCING ORDERS (I) AUTHORIZING DEBTOR TO
OBTAIN POST-PETITION FINANCING SECURED BY A SENIOR LIEN UNDER
SECTION 364(c)(1) AND 364(d) OF THE BANKRUPTCY CODE, (II) MODIFYING THE
AUTOMATIC STAY, AND (III) SCHEDULING
<u>A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)</u>

Allen Memorial Church of God in Christ, Inc., as debtor and debtor-in-possession (the "Debtor"), respectfully represents:

<u>JURISDICTION</u>

1.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief requested herein are Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

BACKGROUND

3. Since the filing of this chapter 11 case, the Debtor has attempted to refinance the mortgage on its property to satisfy its obligations to its secured lender, J P Morgan Chase ("Chase"). Having been previously unable to resolve its obligation to Chase through a refinance its property, the Debtor is fearful that Chase will seek to dismiss the Debtor's chapter 11 case, or in the alternative, seek termination of the automatic stay to commence a foreclosure proceeding that was stayed as a result of the Debtor's filing of the instant Chapter 11 proceeding. In an effort stave off the loss of its property the Debtor's church building located at 132 Crary Avenue, Mount Vernon, New York and the Church parsonage located at 17 Magnolia Avenue, Mount Vernon, New York (collectively, the "Church Property"), the Debtor has been desperately seeking a new lender who was willing to provide financing to the Debtor, as the Debtor is a 501 (c) (3) nonprofit entity and financing for said entities are limited.

4. For the past two years the Debtor and its parishioners explored every avenue of possible financing that was potentially available to it to satisfy the obligation due the Chase which, as of May 13, 205 was in the amount of $1,771,697.19 pursuant to a payoff as of that date (the "Payoff Letter"). A copy of the Payoff Letter is annexed hereto as Exhibit "A".

5. On or about March 7, 2016, the Debtor's "prayers were answered" when it received a loan commitment (the "Commitment Letter") from Elohim Financial Corporation ("Elohim" or "Lender") for $1,900,000 to refinance the obligation owed to Chase and provide the Debtor with additional capital to satisfy other administrative expenses and for general purposes. A copy of the Commitment Letter is annexed hereto as Exhibit "B".

6. After negotiations with Lender, the Debtor executed the Commitment Letter. However, there were various conditions that the Debtor had to fulfill, including providing current financials to Lender. Since the execution of the Commitment Letter and after the Debtor fulfilled

{00682623.DOC;1 }                                 8

the conditions, Lender determined that the Debtor would need to increase the credit facility to provide for additional reserves for Mortgage Interest payments and Mortgage Escrow which increased the loan to $2,150,000 pursuant to the Loan Documents. The Debtor now seeks this Court's approval to move forward with the refinancing and close on the loan. Specifically, the Debtor is seeking an Interim Hearing on an expedited basis to approve the Debtor borrowing the sum of $ 1,617,000 to pay the obligations due the Lender, fees and costs associated with the closing of the loan, establish escrow reserves and to pay certain administrative expenses including US Trustee fees. The Debtor also request that the Court set a final hearing 15 days after the date of this motion to approve the balance of the loan up to the full availability of $2,150,000 for the payment of other expenses including, accounts payable, church capital reserves and other administrative expenses.

      7.      The Debtor is seeking the Interim Hearing on an expedited basis as Chase has made numerous accommodations to the Debtor throughout this process and has agreed to accept $1, 200,000 as a short payoff of the secured indebtedness. The Debtor is fearful that if Chase does not receive payment pursuant of the reduced amounts Chase has agreed to accept on an expedited basis, Chase will no longer be willing accept the agreed to amount and will seek to recover the amounts that it is actually owed. In the event that Chase is no longer willing to accept the short payoff, the Lender will not be willing to lend as the loan negotiations were predicated upon the short payoff that Chase agreed that it would accept. Lender has indicated that it is ready, willing and able to immediately close of the financing. Accordingly, any further delay in the refinance process might result in the Lender abandoning any efforts to assist the Debtor in the Debtor's efforts to retain the Church Property. Furthermore, the Church is now entering its low season in the Summer months for collection of tithes and offerings and the Debtor is is also fearful that if it does not obtain immediate authority to borrow the finds on an expedited basis and to close on the loan as its financial predicament could become worse. Therefore, time is of the essence in the Debtor's

ability to obtain funds through a refinance or the Church Property to satisfy the obligation to Chase. A copy of Chase Settlement Letter is annexed hereto as Exhibit "C".

## RELIEF REQUESTED

8.  The Debtor filed a voluntary petition for reorganization on May 30, 2014 (the "Petition Date"), over two (2) years ago.

9.  The Debtor has continued in possession of its property and the operation and management of its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

10. No trustee or examiner, and no official committee has been appointed in the Debtor's case.

11. The Debtor operates a not-for-profit corporation under the New York Not for Profit Corporations law. It owns (i) the real property and improvements located at 132 Crary Avenue, Mount Vernon, New York, which the Debtor uses as a church (the "Church") and (ii) real property with improvements located at 17 Magnolia Avenue, Mount Vernon, New York, the ("Parsonage") (as stated heretofore, the "Church" and the "Parsonage" are collectively referred to as the "Church Property.").

12. The Debtor has owned the Church since 1998. The acquisition of the church was an historic milestone for the Debtor and the City of Mount Vernon as the Church has enriched the Mount Vernon community by the programs and resources it provides to the citizens.

13. The Debtor provides needed services to the Mount Vernon community including serving as a Polling Place; Community Hub for Public Meetings; Counseling & Referral Center and Music & Fine Arts Center. The Church also provides community Job Fairs; a Food Pantry for seniors and families; Home School Connection and after school network; summer enrichment programs for children; tutorial programs; a clothing bank; a monthly feeding program; a

{00682623.DOC;1 }                            10

Scholarship Fund; and Lifestyle Management programs. The Debtor also made additional improvements to the Church's facility in 2004 which further enhanced the effectiveness of the church in the community.

14. Prior to the Petition Date, the Debtor experienced a consistent rate of growth in membership and financial resources. Unfortunately, the global recession of 2008, negatively affected the operations of many non profit institutions and the Debtor likewise suffered a loss of revenue. The business operations of the Debtor suffered from the impact of underemployment, unemployment and lack of job opportunity. Tithes and offerings fell by approximately $100,000 per year resulting in a downsizing and elimination of certain services.

15. The Debtor's financial predicament became precarious as a result of a balloon payment due to Chase in May 2014, in the amount of $1.7 million approximately.

16. In order to procure financing for purchase of the Church Property on or about December 31, 1998, the Debtor executed a Mortgage Note with The Bank of New York as Lender in the principal amount of Nine Hundred Thousand Dollars ($900,000.00). The Debtor also executed an Assignment of Rents and Leases and Collateral Assignment of Rents and leases for real property located at 410 South Ninth Avenue, Mount Vernon, New York (the "South Ninth Avenue Property"). However, prior to the Petition Date, the Debtor sold the South Ninth Avenue Property, to an unrelated third party.

17. In January 2004, the Debtor refinanced the Mortgage Note with Chase. In order to confirm the liens and consolidate the existing mortgages and to secure the indebtedness to Chase in the amount of One Million Two Hundred Twenty Five Thousand Dollars, ($1,255,000) the Debtor also entered into a GAP Mortgage Note with Chase.

18. Thereafter, on or about March 18, 2008, the Debtor purchased its Parsonage to provide housing for its senior pastor. To secure funds for the purchase of the Parsonage, the Debtor executed an additional Mortgage and Mortgage Note with Chase where the Parsonage

was pledged as collateral to secure, among other things, payments due under a Mortgage Note with Chase as maker dated as of March 18, 2008, in the principal sum of $788,000.00.

19. On or about May 18, 2012, the Debtor and Chase entered into a Forbearance Agreement where the various Mortgages and Mortgage Notes and the Swap loan were modified. The Forbearance Agreement provided, *inter alia,* that the Mortgages and the Mortgage Notes would mature on June 15, 2014 and on said date the entire indebtedness in the amount of approximately $1.7 million would become due and payable to Chase.

20. The Debtor attempted to negotiate a modification of its obligation with Chase. However, Chase refused to modify the obligation. Accordingly, with the payment deadline looming and an inability to procure the funds prior to the deadline to pay the obligation to Chase, facing the prospect of a foreclosure on its Property, the Debtor had no alternative but to seek protection under Chapter 11 of the Bankruptcy Code in order to obtain time to refinance the indebtedness to Chase.[1]

21. As stated heretofore, after two years of seeking financing, the Debtor has finally procured the necessary financing to satisfy its indebtedness to Chase.

Relief Requested

22. By this Motion, the Debtor respectfully requests, pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of interim and final orders for the, inter alia:

> (a) authorization, under sections 364(c)(1) and 364(d) of title 11 of the United States Code, and Rule 4001 of the Federal Rules of Bankruptcy Procedure, for the Debtor to obtain post-petition financing (the "Post-petition Financing") in the form of a credit facility up to a maximum outstanding principal amount of $2,150,000 (the "Total Facility"), in accordance with the Loan Documents, among the Debtor, as borrower, and Elohim Financial Corporation as lender,

---

[1] The Debtor was also fearful that the commencement of a foreclosure proceeding against the Church would cause its membership to leave the Church thereby resulting in the inability of the Debtor to obtain financing.

{00682623.DOC;1 }                                   12

substantially in the form of Exhibit "D" annexed to the Motion, the Interim Order, the final order authorizing the Post-Petition Financing (the "Final Financing Order") and all other agreements, documents and instruments at any time evidencing, guaranteeing or securing the Obligations[2] or the Collateral (as defined hereinafter) (collectively, the "Loan Documents");

(b) authorization to grant to the Lender assurances for the full and timely payment by and performance of the Obligations of the Debtor to the Lender in connection with such Interim Financing and Final Financing under the Loan Documents, including, without limitation, all principal, interest, costs, fees and expenses, all as set forth in the Loan Documents, by granting to the Lender pursuant to sections 364(d) of the Bankruptcy Code, a first priority senior security interest in and lien on the Debtor's Church Property, as set forth in the Loan Documents, subject to a Carve-out for the fees payable to the Office of the United States Trustee;

(c) scheduling and approving the form and method of notice of the Final Hearing.

### The Debtor's Efforts to Obtain Financing.

23.     The Debtor does not currently have any available sources of funds other than the proposed post-petition financing (the "DIP Financing") to refinance its existing debt, avoid the loss of its Church Property and to otherwise be enabled to carry on the operation of its business. The Debtor urgently requires sufficient funds to pay the drastically reduced amounts owed to Chase and avoid the loss of its Church Property. The Debtor's existence is dependent on its ability to obtain the funds made available under the DIP Financing.

24.     The disruption of the Debtor's operations through the loss of the Church would be devastating, not only to the Debtor but to the entire community in Mount Vernon as the Church has been in existence for over 30 years.

25.     Since and prior to defaulting on its Mortgage and Note with Chase, the Debtor surveyed various sources of financing and was unable to procure funds on any terms other than those presently under offer. Under the circumstances, the Debtor concluded that the only

---

[2] All terms not otherwise defined in this Motion shall have the meanings ascribed to them in the Loan Documents.

{00682623.DOC;1 }                                    13

viable alternative was the debtor in possession financing offered by Lender which presented the best and most practical option available and would enable the Debtor to preserve its operations as a church. The Debtor believes that the loan offered by Lender is in the estate best interests and represents an appropriate exercise of the Debtor's business judgment.

<u>Debtor in Possession Credit Agreement</u>

26. Prior to making this motion, the Debtor engaged in good-faith and extensive, arm's-length negotiations with Lender. These negotiations culminated in Loan Documents to provide post-petition financing on the terms and subject to the conditions to be set forth in the final Loan Documents and the Interim Order. A copy of the proposed form of Interim Order is annexed hereto as Exhibit "E". Additionally a proposed form of the Final Financing Order is annexed hereto as Exhibit "F".

27. The significant elements of the DIP Financing [3] and the proposed Interim and Final Financing Orders, are as follows:

    (a) Debtor/Borrower. Allen Memorial Church of God in Christ, Inc.

    (b) Commitment and Availability. The Debtor in Possession Credit Agreement provides for an available credit facility of $2,150,000.

    (c) Term. 240 months.

    (d) Purpose. To pay off the debt owed to Chase; satisfy closing costs and fees; payments to unsecured creditors; establish reserves; and to pay administrative expenses, including US Trustee fees.

    (e) Priority and Liens. Pursuant to Sections 364(d) of the Bankruptcy Code, all of the Obligations shall be secured by a first priority lien on the Property and a perfected first priority security interest in all personal property and/or equipment used in connection with the Property, subject to the carve out in favor of the office of the United States Trustee.

    (f) Carve Out Expenses. All amounts payable to the Office of the United States Trustee pursuant to 28 U.S.C. Section 1930(a).

---

[3] This summary is qualified in its entirety by reference to the provisions of the Loan Documents.

{00682623.DOC;1 }                                     14

(g) Interest Rate. The interest rate on the outstanding obligations shall be 8.95 %.

(i) Documentation. Additional documentation as set forth in the Loan Commitment.

### The Proposed DIP Financing Arrangement Should be Authorized

28. The Debtor's ability to retain its Church Property and meet its working capital needs and avail itself of the opportunity to reorganize can be satisfied only if the Debtor is authorized to borrow up to $2,150,000 under the Loan Documents and to use such proceeds to pay Chase, pay fees and expenses associated with the closing, establish reserves, pay administrative expenses, including UST fees and to fund the operations of the Debtor. The Debtor is also obligated to seek approval for the financing from the Attorney General for the State of New York, Charities Bureau and the Supreme Court of the State of New York and will undertake to do so after approval by this Court.

### Approval Under Section 364(d) of the Bankruptcy Code.

29. The Debtor proposes to obtain financing under the Loan Documents by providing security interests and liens as set forth above pursuant to Section 364(d) of the Bankruptcy Code. The statutory requirement for obtaining post-petition credit under Section 364(d) is a finding, made after notice and hearing, that the debtor is "unable to obtain such credit otherwise and there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

30. The Debtor bears the burden of proof on the issue of adequate protection with respect to the lien which is being primed.

31. With respect to the priming nature of the lien, the existing holder of the first mortgage position will consent to the transaction as its lien is being satisfied in

{00682623.DOC;1 }    15

accordance with the loan to it.

### The Debtor Does Not Have An Alternative to the DIP Facility.

32.     As will be shown at the Interim Hearing, a DIP Financing facility of the type needed in this case could not have been obtained on an unsecured basis or on a secured basis without the imposition of a priming lien.  Alternative sources of proposed DIP Financing for the Debtor, obtainable on an expedited basis and on reasonable terms, were simply unavailable. None of the alternative potential sources of post-petition financing proposed a facility that would meet the Debtor's requirements. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986).

33.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Section 364(c) and (d). Id.; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989). Thus, the evidence introduced at the Interim Hearing will satisfy the requirement of Section 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtor.

### Application of the Business Judgment Standard.

34.     As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtor's management has concluded that the DIP Financing is the only alternative available in the circumstances of this case. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523,

{00682623.DOC;1 }                                    16

550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc. 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially "Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

35. In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. In re: Curlew Valley Assoc., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." Id. at 513-14 (footnotes omitted).

36. The Debtor has exercised sound business judgment in determining that a post-petition credit facility is appropriate and has satisfied the legal prerequisites to borrow under the DIP Financing. The terms of the DIP Financing are fair and reasonable and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted authority to enter into the DIP Financing and borrow funds from the Lender on the secured, administrative superpriority basis described above, pursuant to Sections 364(c)(1) and 364(d) of the Bankruptcy Code, and take the other actions contemplated by the commitment letter and as requested herein.

The DIP Facility is Necessary to Effectively Preserve Its Assets

37. No party in interest can seriously contend that the Debtor does not need immediate access to the DIP facility. Accordingly, access to credit is necessary to meet the Debtor's urgent

need to save its Church property, to pay its administrative creditors, including fees owed to the United States Trustee Program and to emerge from Chapter 11 and otherwise financing its operations. In this case, the inability to access these funds would result in the loss of the Debtor's place of worship and the Church Property.

38. For these reasons, access to credit under the DIP Financing is critical. The Debtor cannot wait for the beneficial effects of the DIP Financing; any substantial delay could have the same impact as denial of the Motion. The Debtor's need for access to the DIP Financing therefore is immediate.

### The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate and provide Adequate Protection to Existing Lienholders.

39. The Debtor is unable to obtain unsecured credit allowable solely as an administrative expense. The Debtor is also unable to secure secured credit without offering to the Lender a senior lien on the Property and first priority security interests in the Collateral. The Debtor submits that proposed DIP Financing reflects the exercise of sound and prudent business judgment. The Debtor would not have been able to obtain financing on an unsecured basis, or otherwise and the prospect of Lender's provision of exit financing provides the Debtor with assurance that it will be able to effectively and expeditiously reorganize in a manner that will be in the best interest of the Debtor's estate and its creditors. In the Debtor's business judgment, the DIP Financing is the best financing option available under the circumstances in this case.

40. The proposed terms of the DIP Financing are fair, reasonable and adequate in that these terms neither (a) tilt the conduct of this case and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits. The purpose of the DIP Financing is to enable the Debtor to retain its place of worship to fulfill its religious purpose and meet ongoing operational expenses.

41. The proposed DIP Financing provides that the security interests granted to the DIP Lender are subject to the Carve-Out.

42. Likewise, the various fees and charges required by the Lender under the DIP Financing are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Section 364 of the Bankruptcy Code. See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under Section 364, including a lender "enhancement fee").

43. The terms and conditions of the Debtor in Possession Credit Agreement are fair and reasonable, and were negotiated by the parties in good faith and at arm's length. Accordingly, the DIP Lender under the Loan Documents should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of such agreement.

Request for Immediate Interim Relief.

44. It is essential that the Debtor immediately be authorized to pay the obligations to Chase to avoid the loss of its house of worship. Absent immediate and financing, the Debtor will be unable to pay this obligation and the entire rationale for this case will be thwarted. Consequently, if interim relief is not obtained, the Debtor's assets will be immediately and irreparably jeopardized, to the detriment of its estate, its creditors, its parishioners and other parties in interest.

45. Accordingly, the Debtor requests that, pending the Final Hearing, the Court schedule an emergency Interim Hearing to consider the Debtor's request for authorization to obtain interim credit in an amount up to the amount necessary to satisfy Chase in accordance with and under the DIP Financing loan documents, in accordance with and pursuant to the terms and conditions contained in the Loan Documents and the Interim Order attached as Exhibit "D".

46. Bankruptcy Rules 4001(b) and 4001(c) permit a court to approve a debtor's request

{00682623.DOC;1 }                                19

for financing during the 14-day period following the filing of a motion requesting authorization to obtain post-petition financing, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(c)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., In re Simasko Prod. Co., 47 B.R. at 449; see also In re Ames Dep't Stores, 115 B.R. at 38. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business. A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. See, e.g., In re Simasko Prod. Co., 47 B.R. at 449; In re Ames Dep't Stores, 115 B.R. at 36.

### Notice

47.  Pursuant to Sections 102(1), 363(c), and 364(c) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), notice of this Motion has been provided via overnight delivery service to the secured creditor, the proposed DIP lender, the City of Mount Vernon, The Attorney General for the State of New York, Charities Bureau, the Debtor's 20 largest unsecured creditors, the Office of the United States Trustee, and all parties having filed notices of appearance.

48.  The Debtor will, within three (3) business days of the entry of the Interim Order by the Court, serve by United States mail, first class postage prepaid, copies of this Motion, the Interim Order and a notice of the Final Hearing (the "Final Hearing Notice") to consider entry of the proposed Final Financing Order on: (i) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Room 1006, New York, New York 10004, (ii) the Debtor's secured lender, J P Morgan Chase, by its counsel, (iii) the Debtor's twenty (20) largest unsecured creditors, (iv) Eric Schneiderman, Esq., Attorney General for the State Of New York, Charities Bureau, 120 Broadway, New York, New York 10271; (v) New York State Attorney General. Westchester Regional Office, 44 South Broadway, White Plains,

{00682623.DOC;1 }                                      20

NY 10601; and (vi) all parties having filed notices of appearance and/or a demand for notices in this case, and any other parties as directed by the Court.

**WHEREFORE,** the Debtor respectfully requests that the Court: (a) enter the Interim Order and set the date for the final hearing; (b) enter the Final Financing Order; and (c) grant the Debtor such other and further relief as is just and proper.

**DATED:**   White Plains, New York
June 20, 2016

      Arlene Gordon-Oliver & Associates, PLLC.
      Counsel to the Debtor

      By: /s/ Arlene Gordon-Oliver
      Arlene Gordon-Oliver
      199 Main St, Suite 203
      White Plains, NY 10601
      Ph. No. (914) 683-9750